**BEFORE THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA**
Columbia Division

Marie-Thérèse H. Assa'ad-Faltas, MD, MPH
                                                                                Plaintiff
v.
Sara Heather Savitz Weiss, individually for damages and for *qui tam* recovery;
The McAngus, Goudelock & Courie law firm, in its corporate capacity for damages and for *qui tam* recovery;
John Andrew Delaney and Sterling Davies, individually for damages and for *qui tam* recovery;
**Jeanette McBride,** officially as RC's Clerk of Court for injunctive relief and individually for damages;
City of Columbia, SC, [hereinafter "*the* City"] for injunctive and declaratory relief and for *qui tam* recovery;
City of Columbia, SC, Police Department (CPD), for injunctive and declaratory relief and for *qui tam* recovery;
CPD former Chiefs and Acting Chiefs [FNU] Burke, Randy Scott, and Ruben Santiago, individually for damages and for *qui tam* recovery; Present or former CPD Officers Julie Ashmore and George McSwain, individually for damages and for *qui tam* recovery; Former SC 5th Judicial Circuit Solicitors Barney Giese and John Meadors, individually for damages and for *qui tam* recovery;
Dinah Gail Steele and Larry Wayne Mason, individually for damages;
Mark Keel, as Chief of SC's State Law Enforcement Division (SLED), *solely* officially and *solely* for injunctive and declaratory relief; Daniel Johnson, as SC's Fifth Judicial Circuit's Solicitor, *solely* officially and *solely* for injunctive and declaratory relief and for *qui tam* recovery; Gary Watts, as Coroner for Richland County, SC, *solely* officially and *solely* for injunctive and declaratory relief and for *qui tam* recovery; Robert Eldon Hood, as Current SC's Fifth Judicial Circuit's Administrative Judge for General Sessions, *solely* officially and *solely* for injunctive if declaratory relief is unavailable or for declaratory relief if available; William Nettles as U.S. Attorney for the District of South Carolina (D.S.C.), *solely* officially and *solely* for injunctive and declaratory relief;
Steven Benjamin, as Mayor, and all members of the City of Columbia ("*the* City") Council;
Teresa Wilson, manager for *the* City; and all their subordinates and agents who intend to injure Plaintiff;
all *solely* officially and *solely* for injunctive and declaratory relief and for *qui tam* recovery,        Defendants

## Complaint for Declaratory and Injunctive Relief, Damages, and *qui tam* Recovery
## (Jury Trial Requested)

### I. Brief Introduction, Summary, and Relationship to Contemporary National Events

Marie-Thérèse H. Assa'ad-Faltas, MD, MPH ("Dr. Faltas"), Plaintiff *pro se*, was falsely arrested and imprisoned mercilessly as if she were an animal *seven times* **without probable cause** by *the* City and Richland County's Sheriff's Department because she and her mother had, in March 2009, bought land unaware that, under and across that land, Larry Wayne Mason and Dinah Gail Steele had illegally and surreptitiously run the sewer lines from two adjacent rental quadriplexes which Mason and Steele used as centers for prostitution, drug dealing, preying on veterans, and fraud on the federal government. It later transpired that Larry Mason had been indicted on 145 counts of embezzlement from the U.S. army and had shot his second wife, *or a woman he passed off as his second wife,* dead but was never prosecuted for it. Public record facts plausibly suggest that Mason and Steele use prostitutes to compromise officials.

Dr. Faltas was also maliciously prosecuted by *the* City on other false charges without arrest. Dr. Faltas defended herself ably *pro se* and was **fully and finally exonerated of charges used as pretexts for the arrests subject of *other* complaints.** In the process of defending herself, Dr. Faltas discovered extreme corruption, criminality and/or unconstitutionality in South Carolina state government and its subdivision, including the fact that selected *state* prosecutors (including Defendant Weiss from 2003 to 2010) are *paid circa $70,000.00/year* by *the* City to bring false criminal charges against *the* City's critics and drop (true?) criminal charges against friends of city officials. The combination of the facts and the law lead to the conclusions that *the* City has made itself a state within a state but out of control of the state, all in violation of the "no new state" provision of the U.S. Constitution and of U.S. federalism which admit of only two sovereigns (federal and state), not three or more. Durham, NC's, Mike Nifong, who tried to frame rich white male Duke lacrosse players lost his law license. But John Meadors, who participated in the conspiracy to falsely frame the Coptic Orthodox Christian indigent female Dr. Faltas, was screened and found qualified to be a judge (but lost the election). Dr. Faltas now sues to recover damages for her 8 July 2010 false arrest and subsequent malicious prosecutions, which, thank God, terminated in her favor on 24 April 2013, and to recover for the federal sovereign the funds Defendants took under pretext of protecting public safety and running courts but misspent, and for declaratory and injunctive relief.

**All the facts are documented in court transcripts, arrest videos made by some Defendants themselves, public records of the criminals Defendants were and are still protecting, *etc.*[1]**

Historically and religiously, the knowing and intentional bringing of false charges had been equated with murder. But now, with so many public officials accused and proven to have engaged in lies and deceit, such schemes have become accepted, even enjoyed and admired. This complaint, humbly but diligently and firmly, seeks to, God willing, restore honesty at least to South Carolina's criminal "justice" system. **Dr. Faltas asks this Court to make the consequences of knowingly framing the innocent so severe it becomes unthinkable.**

This is the first litigation addressing the 8 July 2010 false arrest and imprisonment *and malicious prosecution* from the false trespass and disorderly conduct charges.

Claims for any and all acts of other entities who injured Dr. Assa'ad-Faltas but are not here sued, and for any and all other acts of defendants sued herein which give rise to causes of action other than alleged herein **are not waived** by the filing of this complaint **but are expressly reserved for other complaints to be timely filed in the near future, God willing.**

Each individually-sued defendant's liability to Plaintiff is complete and not diminished by others' acts. Any and all facts recited herein which do not give rise to liability of, or cause(s) of action against, any defendant(s) sued herein are to be understood as recited only to give a coherent factual background and are not to be understood as an attempt to sue for acts to which absolute immunity attaches.

Any and all facts recited herein which relate to cases that have been settled are not to be understood as attempts to reopen the cases but only to give a coherent factual background.

Dr. Faltas incorporates by reference, and prays for judicial notice of, all her allegations, evidence, exhibits, and arguments, in all her cases in SC's state courts, this Court, specially #10-cv-1985-TLW, and other U.S. District Courts, the U.S. Courts of Appeals, and the U.S. Supreme Court. **To that end, Dr. Faltas prays for leave to file and receive electronically as many of her exhibits are videos and videos that are best embedded in an electronically-filed complaint and many of her documents can be hyper-linked to this and other courts' records.**

## II. JURISDICTION and VENUE

1. This Court has jurisdiction under: (a) the U.S. Constitution; (b) the *Ex parte Young* doctrine, 209 U.S. 123 (1908), as explained in *Virginia Office for Protection and Advocacy (VOPA) v. Stewart*, _ U.S. _ (2011); (c) 28 U.S.C. §§1331 and 1343; (d) 42 U.S.C. §1983, as applied in *Mitchum v. Foster*, 407 U.S. 225 (1972); *Dombrowski v. Pfister*, 380 U.S. 479 (1965); *Pulliam v. Allen*, 466 U.S. 522 (1984); and *Tennesse v. Lane*, 541 U.S. 509 (2004); and (e) the Declaratory Judgment Act, 28 U.S.C.A. §2201 *et seq*.

2. Dr. Assa'ad-Faltas is a Coptic Orthodox Christian Egyptian citizen who, since September 2005, has been an alien lawfully admitted for permanent residence in the United States, and, since September 2009, been eligible to apply for U.S. Citizenship. *Saint Francis College v. Al-Khazraji*, **481 U.S. 604 (1987)**, *unanimously* held that, while now classified as white, Middle Easterners and other "**ethnically identifiable subgroups of *homo sapiens*"** are protected by §§1981 and 1983:

   Based on the history of §1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended §1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory. [footnote 1:] We note that under prior cases, discrimination by States on the basis of ancestry violates the Equal Protection Clause of the Fourteenth Amendment. Hernandez v. Texas, 347 U. S. 475, 479 (1954); Oyama v. California, 332 U. S. 633, 646 (1948); Hirabayashi v. United States, 320 U. S. 81, 100 (1943). See also Hurd v. Hodge, 334 U. S. 24, 32 (1948).

3. SC's Code of Laws provides in §14-1-100. **Rights in court shall not be affected by race or color:**

   Whenever authority has heretofore been conferred by law upon any free white person or persons to institute any suit or proceedings or

---

[1] The sheer number of defendants is the natural cause and result of a framing scheme requiring overt acts and negligent omissions of every link in the framing as this very Court seen in the Duke lacrosse case. Dr. Faltas carefully read the main formal opinions and complaints in the Duke lacrosse case and was initially struck by how many people, from police officers to nurses to doctors and lawyers, were willing to lie. Dr. Faltas also carefully watched the internet-broadcast main parts of the later trial and second-degree murder conviction of the Duke lacrosse main false accuser Crystal Mangum and saw much in common between the latter and Dr. Faltas' false accuser in a harassment charge, Teresa Felicia ("Nikki Icecream") Ingram Jackson, including the ability to be a victimizer yet act as a victim and the escalation of crimes with impunity until a crime is committed that cannot be ignored. It has been thought and said that the Duke lacrosse players "brought it on themselves" by hiring strippers instead of studying. **All Dr. Faltas and her mother did to unwittingly unleash all this misery on themselves is identify a neglected small lot of land that was a jungle in the middle of Columbia, SC, buy it from its rightful owner, and legally obtain the necessary special exception to build on it. Such activity cannot be a cause for punishment except in a thoroughly corrupt system.**

to prefer any information or complaint in any matter, civil, penal or criminal, the same rights shall be enjoyed by and the same remedies shall be applicable to all persons whatsoever, regardless of race or color, **subject to <u>the same conditions <i>and none other</i></u>**.

4. All individual defendants acted in an administrative or private capacity, *ultra vires,* in gross negligence and/or extreme malice, to deny Plaintiff her clearly-established constitutional and statutory rights including but not limited to her rights to: (a) not be subjected to *"nol prossequi with leave to reopen"* per *Klopfer* v. *North Carolina,* 386 U.S. 213 (1967); (b) equal access to state courts and reasonable accommodation for the disabled to access state courts per *Tennesse* v. *Lane,* 541 U.S. 509 (2004); (c) observe, as a member of the public, the functioning of the judicial branch of government under the First Amendment per *Richmond Newspaper, Inc.,* v. *Virginia,* 448 U.S. 555 (1980); (d) not be brought before "judge" posing "a constitutionally intolerable risk of bias" per *Caperton* v. *Massey,* 129 S.Ct. 2252 (2009); (e) not be judged by one whose rulings and *intra*-judicial comments show bias even if the bias arose *intra*-judicially per *Liteky* v. *United States,* 510 U.S. 540 (1994); (f) be tried, not by a judge with an indirect financial interest in the case, but an impartial judge in the first instance per *Tumey* v. *Ohio,* 273 U.S. 510 (1927), and *Ward* v. *Monroeville,* 409 U.S. 57 (1972); (g) self-representation per *Faretta* v. *California,* 422 U.S. 806 (1975), and *Indiana* v. *Edwards,* 554 U.S. 164 (2008); (h) control her own defense per *McKaskle* v. *Wiggins,* 465 U.S. 168 (1984); (i) freedom from unreasonable arrests and searches and seizures under the Fourth Amendment; (j) speedy trial for criminal defendant under the Sixth Amendment; (k) sue, gather and give evidence, and make and enforce contracts per 42 U.S.C. §1981; (l) police services; (m) freedom from: (I) arrests for alleged misdemeanors not witnessed by police and (II) police brutality; and (n) be protected from vindictive increase in penalty to chill appeals per *North Carolina* v. *Pearce,* 395 U.S. 711 (1969).

5. The complaint about the false arrest and imprisonment *and malicious prosecution* on the false trespass and disorderly conduct charges is timely brought well within the statute of limitations as keyed, not from the date of the false arrest, but from the date of the final resolution in favor of Dr. Faltas. The claims for declaratory and injunctive relief and for *qui tam* recovery have no statutes of limitations.

6. Venue is proper herein. **"Subject matter jurisdiction is the power to hear and determine cases of the general class to which the proceedings in question belong. Venue is the place of geographical location of trial. The propriety of either is independent of the other.** *Dove v. Gold Kist, Inc.,* **442 S.E.2d 598, 600 (1994);** *State v. Gentry,* **610 S.E.2d 494 (2005)."** *Jeter v. South Carolina Department of Transportation,* **633 S.E.2d 143, 146 (2006).**

### III. False Arrest and Imprisonment and Malicious Prosecution *from 8 July 2010 to 24 April 2013* on False Trespass and Disorderly Conduct Charges

1. All other allegations of this Complaint are incorporated in every section and every claim by reference.

2. Due to history beyond the scope of this Complaint, many City areas are "doughnut holes" surrounded by non-City County areas; and many County areas are "doughnut holes" surrounded by City areas. No rational basis; *e.g.,* rural *v.* urban or commercial *v.* residential, explains those jurisdictional anomalies. In-City residents cannot solve their problem extra-judicially by moving to non-City areas since these are subject to arbitrary unpredictable annexation by City and all residents may have business in City.

3. The 14th Amendment's guarantees of equal protection are violated by: (1) County non-City residents being served and protected by a force headed by a sheriff answerable to all the people in periodic direct elections while County in-City residents are terrorized by an armed force headed by a chief answerable to no one or to layers of bureaucracy appointed by a seven-member Council ["City Council"] elected by complex time and district systems that diffuse accountability; (2) alleged misdemeanors by, and search and arrest warrants of, County non-City residents being adjudicated by SC Governor-appointed magistrates upon SC's Legislature's advice and consent for emoluments unaffected by issues before them while County in-City residents' equivalent cases go to three Ministerial Recorders, few active or retired lawyers appointed by, and serving at pleasure of, City Council for emoluments set and altered by City Council depending on City's budget; and (3) alleged misdemeanors by, and search and arrest warrants of, County non-City residents are assigned to assistants to a Circuit Solicitor isolated from County's non-criminal concerns but answerable to the people in direct periodic elections while County in-City residents' equivalent cases are assigned to assistants to a City-Council-appointed City Attorney whose salary is set by City Council and who also handles all City's civil cases, contracts maters, *etc.*

4. In 2007, City Council appointed Dana Davis Turner as both Chief Administrator and full-time judge of its municipal court. As Chief Administrator, Turner functions as a clerk of court: she archives case files and exhibits, makes all employment decisions for all CMC employees, handles that court's budget,

including setting rates for transcripts and auditing and depositing fine revenues, *etc.*

5. Theretofore, City employees (John Moore, Terry Hooper, Gladys Baker) without any judicial authority fulfilled the duties Turner now executes. Tuner's activities thus violate the constitutional separation of powers (executive and judicial) and SC's prohibition of dual office holding (judge and clerk of court).

6. Aware of the City's self-insured status, its purported "judges" mind the negative consequences to the judges' continued service and/or salaries from findings that City's agents improperly arrested/searched people. In cases of criminal defendants with pending suits against City, the risk of City Attorney using his prosecutorial powers to gain unfair advantage in civil litigation is constitutionally intolerable.

7. CPD-made videos of CPD's 2 December 2009 arrest of Dr. Faltas and ransacking of her car and apartment show CPD Investigator Blanton displaying the warrants to Larry Wayne Mason (a consort of Dinah Steele, Dr. Faltas' landlady and adversary) and boasting: **"I signed them *for you*, Wayne."** The City arrested Dr. Faltas *repeatedly* to make her: (a) halt her public criticism of CPD, (b) plead guilty to false charges brought by CPD in conspiracy with Steele and Mason, (c) surrender her land to them, and (d) relent her push to reopen the cold-case murder of Mason's second wife, Ella Faye Kizer Mason.

8. ***On 7 April 2010, Dr. Faltas appeared before City Council to complain of her 2 and 12 December 2009 false arrests and framing by CPD.*** **City Council proclaimed the issues very serious and promised a fair and public investigation to be completed in two weeks but did not even begin one after many weeks and never released the results to Dr. Faltas.**

9. In May/June 2010, Dr. Faltas obtained Ella Faye Kizer Mason's death certificate (previously filed with this Court under seal) which indicates the cause of death is a gun shot wound to the head and is inconsistent with suicide. Dr. Faltas then met with Richland County Gary Watts, who indicated that the back of the mandatory investigation sheet was left blank by his predecessor, that the investigation was inadequate, and that Coroner Watts appreciates Dr. Faltas' bringing that cold case to Watts' attention.

10. Shortly thereafter, an undisclosed official ran into Dr. Faltas and asked her if there will be a coroner's inquest into the cold case murder of Ella Faye Kizer Mason. Dr. Faltas was surprised; but that official told Dr. Faltas that word of that had reached Charleston and that Larry Mason's having likely gotten away with murder was known and accepted in many circles. Dr. Faltas believes pressure was applied to Coroner Watts to leave the cold murder case un-reopened.

11. **On 8 July 2010, Dr. Faltas was kidnapped by Steele and Mason and called dispatch requesting County sheriff to her rescue. CPD arrived and arrested *her*, not her kidnappers. CPD added a "disorderly conduct" charge for Dr. Faltas' assertion that she cannot be arrested at Heather Weiss' direction without warrant.** All false charges underlying that arrest **were, thank God, fully and finally resolved in Dr. Faltas' favor on 24 April 2013, after her having been unable to leave South Carolina and her having been unable to enter her own apartment until that date, which ended the false arrest**.

12. **C. *Swartz v. Insogna*, 704 F.3d 105 (2nd. Cir.213), should be persuasive to this Court.** The Second Circuit's Judge Newman is highly respected and that case post-dates relevant U.S. Supreme Court and Fourth Circuit decisions. Dr. Faltas had never been "bound over" by a magistrate of quasi-magistrate on the false first-degree harassment charges. Jean Burns' and DeAndrea Gist-Benjamin's terms as "municipal judge" had expired in January 2009 or earlier; and neither was ever re-appointed. Rather, both sat without authority. **In other words: the "judge" was not a judge.**

13. Any bond conditions imposed on Dr. Faltas by Jean Burns or DeAndrea Gist-Benjamin in 2009-2010 which prevented her from returning to her own apartment are void as imposed by a non-judge. Any violation thereof would have been punishable by contempt-of-court proceedings, not trespass charges.

14. The transcripts of the 8 July 2010 calls to 911 and of the 9 July 2010 bond hearing are attached hereto and incorporated herein by reference. The photographs of Dr. Faltas' physical injuries were previously filed with this Court and are incorporated herein by reference. Further, should Dr. Faltas be granted leave to file electronically, she shall, God willing, file good-quality digital downloads of those pictures.

15. **In August 2010 Dr. Faltas again publicly reported to City Council what she saw as the Cooper/Weiss *modus operandi* and showed them CPD's photographs of her injured arms and wrists from her 8 July 2010 false arrest. Mayor Benjamin claimed to be "sure" a fair and thorough investigation will be undertaken.**

17. Delaney of MC&G (hired by Steele's insurance to respond to Dr. Faltas' civil suit) told Dr. Faltas by phone she would be arrested for suspecting that Mason had murdered Ella Faye. Delaney supported

his threat by reading to Dr. Faltas SC Code Section 16-7-1500, which the U.S. District Court (D.S.C.) held unconstitutional but Delaney and his co-conspirators still planned to use to arrest Dr. Faltas.

18. On 23 August 2010, one Orin Briggs tried to mediate a resolution without claiming he represents Dr. Faltas. Briggs phoned Bob Cooper, who pretended Dr. Faltas' cases are in ACA Fernandez' hands but asked Briggs to tell Dr. Faltas that her criticism of Cooper "may be criminal." Coming after Delaney's threat, that convinced Dr. Faltas a fifth arrest of her was imminent. She reported that to state courts.

19. In *In Re Richland County Magistrate's Court, Fifth Judicial Circuit Solicitor W. Barney Giese, Petitioner* (ORIGINAL JURISDICTION) Opinion No. 26876 Heard 5 January 2010, Filed 7 September 2010, SC's Supreme Court held that private businesses may not prosecute people for fraudulent checks before County magistrates. In so ruling, SC's Supreme Court at least implicitly found a constitutionally intolerable risk of the private entities using their prosecutorial power in a criminal justice system to their financial advantage. A reasonable and necessary extension of that ruling is: City Attorney's Office acts as a private entity who might use City's criminal court to City's unfair advantage in civil litigation and contract matters.

20. CPD's agents also wrote overt threats of physical harm, deportation, and new arrests of Dr. Faltas on the media threads where she publicly and cogently criticized various CPD actions.

23. The above and following events show City, CPD, ACAs, and Weiss use the criminal courts to dole out political favors, gain unfair advantages in civil litigation and contract matters, and stifle criticism.

24. Circa 2007, News 19 in Columbia obtained and posted City's highest paid employees' salaries (which are about twice what persons of the same education and experience garner on the open private market) and exposed CPD's cheating scandal. Shortly thereafter, News 19's anchor's husband was arrested and charged with attempted murder. After his exoneration, News 19 became City's proverbial puppy dog.

25. Julie Ashmore was a key culprit in the cheating scandal but *the* City never adequately disciplined her.

26. CPD's Stephan Narewski's acts caused other suits against *the* City, *Anderson v. City of Columbia et al.*, 01-CP-40-04441 (removed to federal Court by Bob Cooper before settling) and *Hammer v. Narewski and City of Columbia,* 2010-CP-40-01097 to 01099 and 2010-CP-40-01288.

27. Circa 2003, *the* City began paying Heather Weiss, an Assistant Fifth Judicial Circuit's Solicitor, to be, in her own words "at the City's beck and call" in the Solicitor's office. That basically meant Weiss made the Solicitor drop or "throw" cases against *the* City's friends and concoct others against *the* City's foes.

28. According to media reports, then-City-Mayor Coble called Weiss on her "day off" because one Durham Carter wanted one Horace Taylor, a juvenile, out of a neighborhood. Weiss then "impressed" them all by threatening to cause Horace's mother to lose her Habitat-for-Humanity home and by also procuring against Horace a bond that prevented him from ever living in, or even visiting, his mother's home.

29. This case presents genuinely justiciable cases or controversies, not political questions.

30. The U.S. Supreme Court might lift immunity from prosecutors who conspire to frame innocents. It granted *cert.* in *Pottawattamie County v McGhee* (08-1065, argued 4 November 2009 but dismissed after case was settled, DECISION BELOW: **547 F.3d 922, CERT. GRANTED 4/20/2009,** *DISMISSED PURSUANT TO RULE 46)* to decide: **"Whether a prosecutor may be subjected to a civil trial and potential damages for a wrongful conviction and incarceration where the prosecutor allegedly (1) violated a criminal defendant's *substantive due process* rights' by procuring false testimony during the criminal investigation, and then (2) introduced that same testimony against the criminal defendant at trial."**

31. In 1979, Dr. Faltas first came to the U.S. as a Fulbright Scholar. In 82 and 88, respectively, she earned her MPH from UNC-Chapel Hill and unrestricted license to practice Medicine and Surgery in Virginia.

32. Dr. Faltas' parents, sisters, brothers-in-law, and oldest nieces were naturalized as U.S. citizens while retaining dual citizenship as natural-born Egyptians *(jus soli)*. Her nephews and youngest nieces are natural born U.S. citizens who also hold dual citizenship as born to Egyptian parents *(jus sangui)*.

33. Dr. Faltas first applied for status adjustment to alien lawfully admitted for permanent resident in 1988. Due to delays beyond this Complaint's scope, her status was adjusted on 13 September 2005.

34. Dr. Faltas resided lawfully and continuously in the U.S. since then with only two very minor traffic tickets in North Carolina in the early 1980's in all her life anywhere in the world. She was thus eligible

to apply for naturalization after 14 September 2009 and to be naturalized by 13 September 2010. That would have qualified her to vote and run for some elective office in the November 2010 election.

35. Dinah Steele owns two quadriplexes on 300 and 304 Byron Road, Columbia, 29209, with 300 set north of 304 which, in turn, is north of three vacant lots zoned C-2 for "neighborhood commercial."

36. Steele's quadriplexes had eight mail boxes in an island in the right-of-way (which also has a public light pole and water meter and *had* City-owned-and-maintained trees) and a 16-car semi-lunar parking lot with cracked surface, unmarked spaces and two wide exits to the north-bound lane of Byron Road.

37. Byron Rd. forks south from Veterans Rd. at Veterans' Extension, which runs north into Garners-Ferry Road, a Columbia thoroughfare which runs east to Sumter and west into Devine St. and Beltline Blvd.

38. Each of Steele's quadriplexes has two upstairs apartments accessible only by a staircase in a hallway accessible through a door with an access code and two downstairs apartments with added back door access to a back yard and an added enclosed room under the balcony of each upstairs apartment.

39. Steele's eight apartments are otherwise identical. The long-term tenants of Steele's downstairs Apts. 1 and 2 of each of 300 and 304 Byron Road were, respectively, Charles Randolph White, William Broll, Mitch Jones, all three white smokers, and John Johnson, black. On information and belief, all four said single males are natural-born U.S. Citizens who pay $325/month to $445/month in rent. Charlene Crouch (white) and Teresa Ingram (black) *were* tenants in Apts. 3 and 4, respectively, at 300 Byron.

40. In August 2008, Dr. Faltas learned she must vacate 436 Byron Road and, on 3 September 2008, rented 304 Byron Apt. 3, for $550/month in reliance on Steele/Mason's representation that the seven other tenants pay, and this apartment's past tenant paid, that sum. **Details of fraud and torts Steele and Mason inflicted on Dr. Faltas are in her state case #2009-CP-40-2219, *summarized* here as background of City's extensive conspiracy to help Steele and Mason against Dr. Faltas.**

41. When Dr. Faltas rented her Byron Road apartment, only one other tenant had more than one vehicle to park there; and Steele and Mason indicated there is no assigned parking for each apartment.

42. Steele asked to see Dr. Faltas' driver license and copied its number on her lease.

43. Dr. Faltas' defenses to the two false first-degree misdemeanor harassment charges on which she was arrested on 2 December 2009 (one of which Weiss tried to Judge Newman and a jury on 22-26 February 2010) are: (1) to the extent she took photographs, made recordings, and asked her neighbors to not smoke at her **all in public,** she was exercising her First Amendment right to speech and her §1981 right to "obtain evidence" for her civil lawsuit against Koon, Steele, Mason, *et al.*; (2) even if all her admitted activities were not constitutionally protected, she had a legitimate purpose for each of them which CPD intentionally ignored; and (3) all other accusations against her are false and made by persons who have: (a) felony convictions of dishonesty and other crimes before they ever met Dr. Faltas; (b) financial needs and incentives to side with Steele and Mason after realizing that Dr. Faltas would never threaten or bribe a witness; (c) objective, concrete and quantifiable public records belying their key testimony against Dr. Faltas; and (d) been coached by Blanton and Weiss for perjury.

44. In her *deposition* in *Ingram v. Trifon,* Teresa Ingram admitted to mental disturbances since 2006, to having been terminated from the Mentor Network on 26 June 2009, to having had a relationship with one Gregory D. Smith which ended, to not having any other friends or family in Columbia, to having been on Hydrocodone after her 29 February 2008 collision with Trifon, and to having been taken "by friends" to a Florence, SC, hospital several months thereafter because she "could not walk." But she denied being married and denied any stress in her life other than from the collision.

45. In her *jury trial* in *Ingram v. Trifon,* Teresa Ingram admitted to being married "but separated," to having used different names in different hospitals, to having been able to avoid the collision "had [she] chosen" to stop for Trifon's car, to having incurred thousands in unpaid repair and medical bills, and to having lied in her deposition about being single. She justified it by a purported long separation.

46. The jury found for Trifon and awarded Ingram nothing. On plausible inferences, that is when Steele, Mason, and City's agents recruited Teresa Ingram to harass Dr. Faltas out of her land and apartment.

47. Also in August 2009, Teresa Ingram began hosting overnight one Richard Allen Cooper, a married 43-year old man with his own assortment of dishonesty and bad driving arrests and convictions.

48. Contemporaneously therewith, Teresa Ingram hosted *inter alia* one Corey Lamont Curry born on 18 December 1980. All Corey's arrests list his address as that of his mother, Jalunda Curry, who had over forty (40) eviction cases brought against her by City's Housing Authority.

49. At age 19, Corey pled guilty to burglary on 30 Oct. 2000 and was sentenced to three years suspended on two years' probation, #G419534, indictment #2000-GS-40-51217. He was arrested on 4 August 2001, in a motel on 135 Veterans' Road (300 yards from the Byron Road quadriplexes) for possession of cocaine with intent to distribute it near a school. Per CPD case #01-25794, Corey said he sold "the Crack to pay his probation fee." Per G837745, indictment #2001-GS-40-06026, Heather Weiss was the prosecutor who negotiated his plea to "0183-Drugs/MDP, Sch I (B) & (c) & II-1st offense" from "0112-Drugs/manufacturing and distributing ice, crank, crack cocaine-1st offense," on 29 Nov. 2001, whereupon SC Circuit Judge Barber sentenced Corey under the Youthful Offender Act to up to five years with credit for 118 days served. On 31 March 2005, Corey Curry was again arrested for drug possession. On 16 Dec. 2005, he pled guilty to a reduced drug charge and was sentenced to the 40 days he had served and to suspension of his driver's license. After Dr. Faltas' February 2010 trial, Corey continued his life of crime, including convictions of speeding, #E271452, in 25 March 2010 and July 2012, arrest for "transprtation for prostitution" in March 2012, convictions for possession and sale of stolen goods in April 2011 and arrest for PWID marijuana in August 2013, which was resolved with his pleading guilty to repeated possession.

50. Charlene Crouch was born on 2 November 1968 and had over twenty arrests resulting in convictions for CDV, drugs, disorderly conduct, grand larceny, *etc*, in Fairfield and Charleston Counties before Charles White "picked her up from the streets" and brought her to Byron. Her 10-year driving record (pulled by Blanton on 11/11/2009 at 4:50:27 pm) shows a DUI conviction and six-month suspension.

51. White was Charlene Crouch's "bond entity" for her 11 July 2007 warrant # K171203 for grand larceny of "two car DVD players, a Canon digital camera, a wrist watch, and a set of car keys" from Peter Elias, to which she pled guilty on 15 August 2007 before SC Circuit Judge Nicholson in Fairfield County, #2007-GS-20-0350 and was sentenced to restitution of $3,250.00 and three-years suspended upon three years' probation. She was rearrested in October 2007 for drugs in a stolen vehicle with Jerome Boyd (who has drug convictions) and George Byrd, Richland Sheriff Case 0710159417. Also with Boyd, Crouch was sued by a Reginald Watson, 2007-CP-20-0295, for vehicular injury. The case was settled.

52. Charlene promptly made herself a record in Richland County: on 25 October 2007, Lea Walker asked the sheriff to protect her elderly ex-husband, Carson, from Crouch's taking his money in return for "living with him as a prostitute." And on 23 October 2007, Larry Wayne Mason, "Private Investigator, SLED Lic. # 0658" affied that he served her with Lykesland Magistrate case #2007-CV-40-106-2936 wherein Charles White, of 300 Byron Road, Apt 1, Columbia, SC 29209, swore out a restraining order against Crouch because: "3. On October, at 2:00 o'clock PM at night [sic] 300 Byron Rd Apt 1 which is in Richland County, S.C., the conduct complained of occurred when the defendant: screamed, beat on door, woke up neighbors, used foul language, and said would damage my vehicle if I did not open door" "On October, at 3:15 o'clock PM [sic] at 300 Byron Road which is in Richland County, S.C., the conduct complained of occurred when the defendant: she was drunk, screaming, & fighting with her sister in Apt, and begging for money to buy drugs, Later I found out both were prostitutes and took them to Decker Blvd and left them" *** "Sworn [on] 23 October 2007 [before] Amber L Brazell." A hearing was scheduled for 20 November 2007 but no one showed up. Crouch then rented Apt. 3 and apparently secured a minimum-wage job as a cashier at Save-A-Lot while on probation for grand larceny.

53. Plausibly, Crouch was misappropriating disability checks sent to the previous tenant's ward.

54. Dr. Faltas believes Teresa, Rodney, and Curtis Ingram, and Charlene Crouch were paid to falsely testify against Dr. Faltas in the 22-26 February 2010 General Sessions jury trial and other proceedings. The above objective, concrete and quantifiable facts leading to her conclusion were known to Weiss, who had prosecuted Corey Curry and is an acquaintance of Marjorie Trifon.

55. Dinah Gail Steele was born on 28 May 1957. She married Fred Bartlett (later arrested for counterfeit trademarks) in 1984, divorced him in 1987, and apparently started a hair salon with her divorce settlement. Between 2001 and 2007, she was a private detective in Larry Mason's agency. She bought the quadriplexes in April 2006 from a James P. Schneider and apparently used a Las Vegas marriage *license* to get a "military dependent" card as Mason's wife. But there is no evidence Steele ever married

Larry Mason. Steele testified that she files income tax as single, not married filing separately, and she never changed her name.

56. Larry Wayne Mason was born on 30 May 1945. Without a high school degree, he joined the U.S. Army in 1964 and retired in 1984. He does not appear to have seen combat or risen through the ranks. He has few lowest-order ribbons and medals for in-service training. In 1967, he married Mary Ann Loop and adopted her biological daughter, Angela Marie. Richard Wayne Mason was born on 10 January 1968. In 1976, Larry deserted the family; and on 12 September 1979, the couple's divorce was final.

57. When he was indicted by a federal grand jury on "109 counts of falsification of government records, one count of embezzlement and one count of impersonation of a United States Army Warrant Officer, 18 U.S.C.A. Sec. 912 (West 1984)," Larry Wayne Mason claimed indigency and was appointed a lawyer from the private bar. *U.S. v. Mason*, # CR-86-247 (D.S.C.), and Unpublished U.S. Court of Appeals for the Fourth Circuit's case No. 89-5675, argued 4 October 1990, decided 29 November 1990.

58. An Ella Faye shows up as Larry Mason's second wife in three Richland County Court of Common Pleas debt collection cases: *Brinkley v. Mason*, 90-CP-40-01237 (settled), *Thigpen Distributing v. Mason*, 93-CP-40-00447, and *NationsBank v. Estate of Faye Mason*, 94-CP-40-00569.

59. Per SC Death Certificate #93-012526, Ella Faye Kizer Mason had a "gunshot wound to the head" **not** consistent with suicide on 24 May 1993 at her 2816 Chatsworth Drive home and was taken by Larry Mason to Richland Memorial Hospital where she died the next day. Larry Mason petitioned to be her executor, #98-ES-40-30776, after the debt collection cases were dismissed due to a lack of executor.

60. Christopher James Mason, who was born to the couple on 6 June 1986, "sold" his half of the house to his father for $17,933 on 18 November 2002. On 16 March 2007, Larry Mason sold the whole house to Osborne Daniels for $230,000.00 and then moved to Elgin, SC, to live with Dinah Steele.

61. Christopher Mason has many alcohol, traffic, and drug arrests and convictions, on the 2008 one of which his address is listed as 304 Byron Road, Apartment 3, Columbia, SC 29209. He was the tenant before Dr. Faltas and paid **nothing** for the very apartment Dr. Faltas was told rented for $550/month.

62. CPD and Weiss knew or could have known all the above when they falsely claimed Dr. Faltas had "harassed" all the above-listed convicts who, according to Weiss and CPD's lies, were too afraid of Dr. Faltas to talk to CPD or give written statements.

63. In November 2008, Dr. Faltas learned that the northern most part of the vacant land immediately south of the 304 Byron Road quadriplex was really the "pole" end of a "flagpole" property addressed 311 Veterans Road and intersected by the I-77 irrigation ditch. She located the owner and he agreed to sell her the "pole" end if she could get permits to subdivide it from the main property and build on it.

64. Dr. Faltas appeared before City's Board of Zoning and Appeals (BOZA) on 10 February 2009, to obtain her special exception to build, on what is zoned C-2 for "neighborhood commercial" a private residence. Video of that appearance is on Marie Faltas' Face Book page. BOZA unanimously approved her application on finding that her proposed building will "improve" the esthetics of the area.

65. On 15 February 2009, Teresa Ingram called police to report: "No name//white building//ex boyfriend just came by her home and threaten to kill her//time lapse 20 min//male left in a green Bonnieville LSH tow Garners Ferry //Female Sts that male poss went home 624 Columbia College Dr// Also sts that male has been continuously harassing her by leaving notes on her door." Incident L 223.

66. Officer Rivers arrived to meet Ingram under Dr. Faltas' window. Hearing noises, Dr. Faltas asked if there is risk and was told all is "under control." CPD report#090004067, approved by Christopher Roberts, reads: "**Victim: Ingram, Teresa. Suspect: Smith, Gregory D. BM 41. DOB 4/28/1967. Height 507. Weight 191. Phone: 803-447-5493. Victim stated the listed subject came to her apartment on 02/13/2009 and began beating on her door asking her to come out of her apartment to talk. Once she refused the subject began shouting and threatening her with bodily harm. She further stated the subject has called and text specific family members threatening her if she keeps refusing to talk with him. The subject and the victim were girlfriend and boyfriend up to four months ago. She stated once she ended the relationship he made her life miserable.**" "**She stated she is now scared of the subject because on several occasions he has personally threaten to kill her. The subject told the victims brother if she continues to ignore him she going to regret it and he does not care about going to jail. The victim also produced a hand written not the subject left on her door threatening her. She sated she has told the subject numerous times she does not wish any contact with**

**him but appears to have no affect.**"[sic] That Sunday, Steele and Mason made a detour on their way to a "boat show" to change the entry code on Building 300's front door upon Teresa Ingram's request. Dr. Faltas happened by and they told her the story. CPD's supplement reads: "**[She] does not wish to prosecute the case she indicated the suspect no longer contacts her. I advised the victim that the case would be closed with no prosecution.**" Case ends: "**Administrative Values. Reporting [and Follow Up] Officer: 02/25/2009 14142 Montgomery Wayne H. Approving Officer: 02/27/2009 09161 Drafts George A.**"

67. Teresa Ingram later stood under Dr. Faltas' window and loudly abused a neighbor across the street who had asked Ingram about that event. Still later, Dr. Faltas told Ingram she should apologize to that neighbor "if she loves God" and asked Ingram to recite the Lord's prayer as an antidote to anger.

68. On 31 January 2009, the 304 Byron Road Apt. 4 tenant vacated because her roof leaked. Steele and Mason worked on it often in February and March 2009. On one occasion, Dr. Faltas asked to see the view from that vacant apartment's balcony and found it had a good view of her prospective land. She offered Steele "a package deal" of $750/month for the two apartments from March to June 2009. Steele said she would consider it if she found no other tenant and invited Dr. Faltas to Steele's hair salon for a hair cut and wrote Steele's name and work number on a piece of paper Dr. Faltas kept.

69. Richard Glenn and Alden Hollis were born to Virginia Spotts and adopted by Leah Wheeler. Both are listed as year-long employees of Mason's private detective agency. Alden Hollis Wheeler bought a house on 2823 Chatsworth Drive (across the street from Mason) and lived in it for years. Richard Wheeler has at least one felony conviction of obstruction of justice. Both Wheelers have an extensive litigation history which is typified by the "diamond ring" case and the "motorcycle" case wherein one brother makes an illusory purchase of an expensive item and keeps it for free after many lawsuits.

70. Mason typed a statement for Alden Wheeler to sign in April 2009, but the signature is dated "the 22nd day of Sept. 2009" and "witnessed" by Larry Mason on "this 21st day of September 2009." Alden Wheeler's statement poses as a stranger happenstance passer-by who was dissuaded from renting by Dr. Faltas' pretense that *she owns* the quadriplexes but has no apartments for rent there.

71. While the statement is internally inconsistent and facially implausible, the truth is: then and thereafter, Wheeler lived in a house at 14 Sweet Oak Drive where he was arrested in January 2010 for battering his fourth wife, Alfya Wheeler. Alden Wheeler was not looking for an apartment to rent in April 2009. But having already lost his soul to the above schemes, he had nothing more to lose by falsely posing as a potential renter "run off" by Dr. Faltas. Blanton and Weiss used him willingly. The issue is not only that a jury would not have believed Wheeler with that information, the issue is that Steele and Mason suborned Alden Wheeler to falsely pose as potential tenant and to falsely testify that he was "run off" by Dr. Faltas' pretense of being the landlady.

72. Similarly, for Rodney Ingram's story to work, he has to have visited his sister daily for years without knowing who her landlady is. He testified the signature on "his" statement used against Dr. Faltas is not really his. His signature on a deed of another landlocked acre in Sumter is indeed very different.

73. Dr. Faltas has a solid alibi for the date and time the forged letter claims she was idly sitting in the parking lot running people off: she was in court filing her civil lawsuit in person. The issue is not that a jury would ultimately have disbelieved the false accusations but that no one should be subjected to the ordeal of a criminal re-trial and harsh bond conditions in the interim, all on known false evidence.

74. The initial version and the court-accepted amended version of Dr. Faltas' complaint in 2009-CP-40-2219 against Steele and Mason alleges they tried to run Dr. Faltas off as soon as they discovered on 12 March 2009 that her mother and she bought a small parcel adjacent to Steele's two quadriplexes. Said parcel was later assigned the address of 324 Byron Road, Columbia, SC 29209; and on it Dr. Faltas plans to build what, God willing, may be South Carolina's first completely solar house.

75. Steele and Mason needed to run Dr. Faltas off because they and Schneider knew (but *the* City and Dr. Faltas initially did not know) that the sewer lines from 300 and 304 Byron Road had been illegally and clandestinely run under and across the 324 Byron Road land to camouflage them from view and thus avoid paying initial tap fees and later monthly sewer bills to *the* City.

76. Dr. Faltas had to await the formal "special exception" approval letter in order to seek permission to subdivide the property so her mother and she may buy the "pole" end of the "flagpole" property addressed 311 Veterans Road. That approval arrived towards the end of February 2009 but it had a

thirty-day appeal period wherein any aggrieved applicant or neighbor may seek review and reversal.

77. On 2 March 2009, Dr. Faltas paid Steele for the March 2009 rent and received a receipt.

78. On Tuesday, 3 March 2009, Dr. Faltas closed on the land and registered it on Friday, 6 March 2009.

79. In the afternoon of Thursday, 12 March 2009, Dr. Faltas had workers clearing the overgrowth from the land. Jones saw her and she told him that she bought that land. He asked: "When will you start building?" She answered: "I just did." Less than an hour later, Steele showed up and asked: "What is going on?" Dr. Faltas answered: "I bought that lot." Steele exploded in profanities and threats to stop Dr. Faltas from building. Dr. Faltas went upstairs to her apartment and Steele stood under Dr. Faltas' window continuing with her threats and insults. Then the phone rang and it was Larry Mason heaping more insults and threats on Dr. Faltas. Then the lead worker came to tell Dr. Faltas he could not contiue, which she took to be a result of intimidation by Steele and called police to give Steele notice to not trespass on Dr. Faltas' land or interfere with her hires. CPD Officer Priest came and did so.

80. After 10:00 p.m. that night, Mason knocked hard on Dr. Faltas' door. Afraid of what Mason could have left at her door, Dr. Faltas called police who came and found he had left two "eviction" letters.

81. On Friday, 13 March 2009, Mason went with Tetterton to City offices trying to get Dr. Faltas' special exception reversed. On Saturday, 14 March 2009, Steele and Mason tried to collect petitions from the neighborhood to prevent Dr. Faltas from building on her land. When Dr. Faltas returned, Mason told her the address sign she now has on her land is his and he will have her arrested for stealing it.

82. Dr. Faltas then called police to prove she had stolen nothing. But Mason flashed her a badge, claimed to be a retired police officer whom no one can touch, tried to take her cell phone from her and insisted he can arrest her himself without police. She became terrified. CPD arrived but did not help her.

83. In a phone conversation later that day, Mason reiterated his claim that he can influence every judge in South Carolina and threatened to get Dr. Faltas deported if she does not "go back to where she came from," told her he had gone to City offices to see her application and her drawing "looks like a church."

84. Tetterton, Mason and Steele conspired to try to get Dr. Faltas' special exception reversed under a false claim that City had not properly posted the BOZA public hearing notice. City had prominently posted the notice at the 311 Veterans' Road address of the property to be discussed at the BOZA hearing and advertized it in the Columbia Star as required by law and ordinance. Steele and Mason falsely claimed that, had they seen the notice, they could have convinced BOZA on 10 February 2009 to deny the special exception because "you can't put a residence next to commercial property. It looks stupid. BOZA would undoubtedly have rejected Mason/Steele' specious objection since City staff reported to BOZA that, while the area is zoned C-2, it has more single-family units than commercial buildings. Also, the BOZA member who introduced a motion to approve Dr. Faltas' special exception had based it on a finding that Dr. Faltas' proposed building "will improve the esthetics" of the area.

85. Yet, Dr. Faltas became justifiably worried about the delay effect of an appeal by Mason/Steele. So, she called Mason and Steele trying to understand what really bothered them about her proposed building. They referred her to Tetterton, "their lawyer," whom she later called warning him against a frivolous appeal of her special exception and suggested that he gets to know his prospective client by reading Mason's other lawsuits before representing him. Tetterton later told Dr. Faltas that he took her advice and read her other lawsuits and mentioned deportation. Dr. Faltas responded that she has a Green Card and suggested making peace instead. He invited her to submit a settlement proposal, which she did with narrow time limits. Tetterton's response was that he will not represent Steele or Mason.

86. Circa 20 March 2009, Dr. Faltas also called SLED about Mason who claims to be SLED-licensed but uses his badge to terrorize Dr. Faltas and try to run her off. Agent Jimmy Dowling met Dr. Faltas on 25 March 2009 and met Steele/Mason on 26 March 2009. He also checked with Fort Jackson if Mason had been awarded any "retired military badge" and was apparently told that Mason made one up.

87. On 25 March 2009, at 2:35 p.m., Dr. Faltas filed civil suit #2009-CP-40-002219 against Steele, Mason, the Koons, and their family-owned companies. In it she sought a restraining order to prevent Steele and Mason from further harassing and threatening her and interfering with her building plans.

88. No hearing was scheduled in Common Pleas. So, Dr. Faltas sought the restraining order from then-

Richland County Chief Magistrate Womble. He scheduled a 14 April 2009 hearing. But at the time of the hearing he ruled that Mason "has a right to file false charges" against Dr. Faltas and denied the requested order. Dr. Faltas appealed and a transcript of that hearing was later obtained and filed.

89. On 26 March 2009, Dr. Faltas met Orin Briggs in downtown Columbia to lead him to Steele' salon to serve the summons and complaint. Steele accepted service for herself and Steele Enterprises. On 27 March 2009, Briggs served the Koons and returned to Steele's salon to serve Mason. Steele protested that Mason "never comes here" and refused to accept service for him. Dr. Faltas obtained Mason's home address from his other suits and gave Briggs the directions obtained from the server of that prior suit. Briggs traveled alone to Mason's home in Elgin in April 2009 and posted the papers there.

90. Steele and Mason did not appeal Dr. Faltas' special exception as they had threatened but they filed an eviction action against her on 1 April 2009. She moved for its dismissal and asked for trial by jury.

91. In April 2009, Dr. Faltas filed against Steele a complaint for housing discrimination by national origin and disability with HUD, which referred it to SC's Human Affairs Commission "SCHAC."

92. In response, Steele and Mason wrote SCHAC "under penalty of perjury" that Dr. Faltas is an illegal alien under "Congressional investigation," steals from WalMart, sued "the University of California," and will sue SCHAC, harasses her neighbors and was not overcharged any rent. Forced to admit that the lower floor apartments rent for much less than Dr. Faltas', Steele falsely pretended to SCHAC that the upper floor apartments rent for $500 each and Dr. Faltas' apartment previously rented for $550.

93. In April 2009, Dr. Faltas saw a black male knocking on Building 300 over 20 minutes then taking his dog to relieve itself on her land. She finally asked him who he was and what he sought. He told her he was Ingram's cousin who came from Sumter, showed her a driver's license with his picture and the Rodney Ingram name, told her "Nikki's" home phone was turned off due to none payment, that her car was there so she must be inside sleeping, and he knocked so hard to wake her. Fearing he might have thought she questioned him because of his race, Dr. Faltas assured him the only reason she did is that "Nikki" Ingram had called police to prevent her ex boy friend, whom Dr. Faltas had never met, from returning and perhaps, due to that experience, "Nikki" did not want visitors for a while.

94. On 18 April 2009, Steele and Ingram tried to give Dr. Faltas a notice that she "ran off" somebody and told her they were going to spray her apartment against her will and "get" her. She called police to try to prevent an event that might cause her a fatal asthma attack. Defendant Gomez-Rivera showed up and began telling Steele and Mason that he had arrested Dr. Faltas many years ago and suggested she was guilty. Dr. Faltas sought a supervisor. CPD Sgt. Auld responded. Dr. Faltas complained to him that CPD officers should not be telling false stories about her to others. Auld did not take a report.

95. Those incidents drilled into Dr. Faltas a necessity of documenting everything with photos and tapes.

96. In researching Steele and Mason's other litigation history Dr. Faltas had found no record of a Mason divorce from his second wife, Ella Faye, though they had been sued jointly. Dr. Faltas then suspected that Steele and Mason were not married and began to suspect their other activities.

97. In April 2009, Dr. Faltas was served with Delaney's answer on behalf of Steele and Mason in the civil suit. Knowing that he was with MC&G, Dr. Faltas suggested to Delaney that they seek a resolution as was done in the UDR case. He set up an appointment with her and asked for her permission to record it. She agreed on condition that he give her a copy of the recording. During that meeting, Dr. Faltas asked Delaney if Steele and Mason were married. Delaney said they were. Dr. Faltas asked what happened to Mason's second wife. Delaney responded that she had died. Dr. Faltas asked if Mason had killed her. Delaney responded he was "sure" that wife was not killed but died "of natural causes."

98. During that meeting, Dr. Faltas told Delaney that she would consider Steele's and Mason's further efforts to spray her apartment with chemicals to aggravate her asthma "an attempted murder."

99. During that meeting, Dr. Faltas gave Delaney a very reasonable settlement proposal package of less than ten thousand dollars. It consisted of (a) refund of all excess rent she paid, (b) small compensation for each day of her work on the lawsuit, and (c) no further interference with her building plans.

100. Delaney said he will get her a response but never did and never gave her a copy of the recording until after she had been arrested, and then it was only his honest paralegal, Tometta Johnson, who did.

101. In April 2009, *the* City and Dr. Faltas discovered that the sewer lines from Steele's quadriplexes had been illegally and secretly run under what became 324 Byron Road. Still later, Dr. Faltas discovered that the 304 Byron Road building was not sufficiently set back the minimum five feet from the property line with what became 324 Byron Road. Dr. Faltas then understood that the sewer lines and set-back problems motivated Steele and Mason's acts and decided to amend her complaint to reflect her recent discoveries. In May 2009, Dr. Faltas asked then-Chief-Civil-Administrative Judge Barber for a status conference to see if the Defense would consent to her amending her Complaint, to explore settlement, and other issues. The Defense requested the status conference be transcribed and it was. In it, Judge Barber correctly stated the law that leave to amend would be freely given, directed that discovery proceed till the eve of trial, and promised the case will be called for trial promptly at the one-year mark.

102. Dr. Faltas filed a proposed amended and supplemental complaint and motions for leave to amend, for injunction, for some defendants' default, and to compel defendants to make discovery. The Defense's and her motions were scheduled for Friday, 10 July 2009 before visiting Circuit Judge James.

103. Jury trial on Steele's application for eviction was set for Tuesday, 14 July 2009 in magistrate court.

104. On 18 June 2009, Dr. Faltas mailed her patent application for her inventions on building her house on the land she and her mother bought. On 19 June, Dr. Faltas filed for a building permit with City. On 20 June 2009, her mother suffered life-threatening event requiring at least one day-long surgery.

105. Early on Monday, 6 July 2009, one of Dr. Faltas' two sisters called to say their mother had a potentially terminal event. Dr. Faltas needed to reschedule the court events before flying and was directed to have her mother's hospital fax a certificate to the magistrate's office, which was done. Later in the day, Dr. Faltas' sister reported that their mother survived that event but needed more family at her bedside for the indefinite future. Dr. Faltas then addressed Judge James in open court to try to have the hearing moved forward to that Monday and His Honor read the hospital certificate in open court, had his law clerk contact defense counsel, and directed Dr. Faltas to return to court at 2:00 pm. There and then, Judge James announced that Defense counsel could not appear.

106. Dr. Faltas flew to her mother's bedside in Cincinnati for two weeks in July and had to fax the magistrate another hospital certificate on Monday, 13 July 2009. The July eviction trial was continued to 29 September 2009 and the Common Pleas hearing was continued to 19 October 2009.

107. Thank God, Dr. Faltas' mother survived but continued to be physically and emotionally vulnerable.

108. On returning to Columbia, Dr. Faltas found Delaney had, a day after she flew out, sent her requests to deny "within 30 days or it be deemed admitted" that she had stolen the address sign but was never subjected to discrimination, defamed, defrauded or otherwise harmed in any way by his clients. Dr. Faltas understood that Delaney and his clients counted on Dr. Faltas' mother's illness detaining Dr. Faltas in Cincinnati for months during which they could get her lawsuit dismissed in her absence. She warned Delaney that his vulturism ruined all good will his firm earned during the UDR settlement.

109. To effectuate her building plans, Dr. Faltas asked City to re-route Steele's sewer lines away from Dr. Faltas' land. City offered to cover part of Steele's re-routing costs and suggested, as an alternative, that Steele buy an easement from Dr. Faltas. Either option would have cost Steele ten thousand dollars. Stleele refused and decided to get rid of Dr. Faltas and her mother at tax-payers' expense instead.

110. Knowing Dr. Faltas' mother co-owns her land, Delaney, Davies and MG&C, began conspiring with Steele, Mason and others to cause Dr. Faltas' mother's death and run Dr. Faltas off from Columbia. In July 2009, the tires on Dr. Faltas' mother's truck, parked beside Dr. Faltas' car, were slashed. Also in July 2009, Ingram and Crouch falsely told SCHAC that their rent is $500/month each.

111. In July 2009, Delaney asked Judge Barber for another status conference which got scheduled for 5 August 2009 and conducted as a discovery hearing. Its transcript is amazing in hindsight. In it, Delaney asks Judge Barber to deny Dr. Faltas' right to supplement her complaint with the added torts Steele and Mason inflicted on her. The judge refuses. Dr. Faltas asks Judge Barber to compel Steele to produce the leases and rent receipts of the other tenant as they are probative of Dr. Faltas' claim that she was overcharged for an identical apartment based on her national origin and disability. Delaney objects and concocts an idea that Dr. Faltas had "confrontations with other tenants" and therefore their leases and rent receipts should not be produced to her. Judge Barber orders them produced

subject to a confidentiality order. Koon's lawyer says he wants the circa 300 pictures Dr. Faltas disclosed she has against his clients on his terms without prepaying for good quality reprints. Judge Barber directs that copies be made at Koon's lawyer's expense without regard to quality. Judge Barber implied no judge wants to hear Dr. Faltas' motions and voices doubts her case will ever be tried.

112. Due to the false testimony, SCHAC marked Dr. Faltas' complaint as "no cause" on 13 August 2009.

113. In later August 2009, Delaney's paralegal prepared some of Steele's discovery responses ordered by Judge Barber. These responses listed Ingram's rent as $325/month and Crouch's as $375/month.

114. Based on that proof of Steele's prior lies to SCHAC, Dr. Faltas asked SCHAC to reopen. SCHAC did.

115. Thereupon, Steele and Mason made Delaney change the discovery responses and also wrote SCHAC that they are getting politicians, including then-State Senator Jake Knotts, involved in the case.

116. On receiving the falsifed "amended" discovery responses, Dr. Faltas wrote Delaney, with a copy to the Office of Disciplinary Counsel (ODC), that she does not know what Mason had on him to make him do that. ODC opened and investigation and Delaney called Dr. Faltas "a thorn in his side" and vowed to threaten her medical license as she had jeopardized his law license by copying ODC.

117. Throughout Spring, Summer and Fall 2009, Mason and Steele had "numerous contacts" with City Attorney Ken Gaines about Dr. Faltas. On 29 September 2009, Gaines so wrote to Steele and Mason.

118. On 26 June 2009, Teresa Ingram was terminated from the Mentor Network and had men pay her rent for her. They would argue with her loudly about it in the parking lot. That disturbed Dr. Faltas.

119. On 20 August 2009, White put in Dr. Faltas' mailbox a letter from a "concerned neighbor" warning her that, to protect their own interests, tenants will testify for Steele and "just about everyone who lives here has skeletons in their closets." Dr. Faltas did not *then* know what the skeletons in the closets were but concluded Steele and Mason knew and used them to pressure tenants to do Mason's bidding.

120. Ingram had simultaneously over-extended herself with new furniture from Aaron's and medical bills from Fields' Chiropractic, hoping thereby to inflate her jury demand. After the jury verdict against her on 26 August 2009, she promptly offered her services against Dr. Faltas to Steele and Mason for pay in the form of free rent. Ingram and her brother, Cio/Ceo, Curry, and Richard Cooper, all of whose names were then unknown to Dr. Faltas, began to harass and threaten her. Jones also intensified his intentional smoking towards Dr. Faltas' apartment to aggravate her asthma. She often politely asked him to smoke less and/or elsewhere.

121. In her applications for approval of her plans to develop her land, Dr. Faltas learned about flood plains and flood hazards, which include electrocution by wiring not safely above flood level and non-secured buildings floating in a flood. She noticed unsafe wiring and a below-flood level storage shed behind her apartment. She reported those violations and others to City's fire and inspections departments.

122. A dentist's office at 200 Byron Road with a properly permitted-and-built shed is immediately north of 300 Byron Road. But a County map incorrectly shows that office's address *also* as 300 Byron Road.

123. In response to Dr. Faltas' complaints about Steele's unsafe and unpermitted shed, Mason decided to find information about the dentist's shed's history and present its permit as his own because it has a duplicate 300 Byron road address. On 5 September 2009, Steele and Mason invited the dentist onto the parking lot and engaged him in conversation, probably about his shed's permit.

124. Dr. Faltas needed to photograph Steele and Mason talking to other owners in the area because they had previously denied having contacted the other neighbors to sign petitions against her. Dr. Faltas thought Steele and Mason were starting with the dentist a new petitions drive against Dr. Faltas' building plans. Although Steele and Mason posed for Dr. Faltas and waved at her while she photographed them, they immediately called police claiming she was "trespassing" on the very parking lot of the apartment where she lives.

125. CPD did not note that this was a public parking lot, and if private, was not fenced and did not have the required "no trespass" signs on all four sides of the property. Instead, CPD negligently gave Steele an incident report and coached Steele how to take out a courtesy summons against Dr. Faltas.

126. On 21 March 2013, the City finally brought that false trespass charge to trial. **The jury found Dr. Faltas NOT GUILTY of trespass.** But that count of false and malicious prosecution is NOT aserted in *this* Complaint to simplify matters as far as possible. It shall, God willing, be the subject of future litigation and is mentioned here only as part of a coherent narrative and to show the City's pattern and practice of fasle criminal charges against Dr. Faltas.

127. In early September 2009, Mason and Steele wrote Dr. Faltas that they will enter her apartment, spray it, and photograph its interior. She wrote them that, per her lease and SC Residential Landlord Tenant Act ("SC's RLTA"), they can do so only with her permission and in her presence and offered them 21 September 2009 as a suitable date. They refused to acknowledge her letters and kept sending her duplicate notices reiterating their plan to force themselves into her apartment on Monday, 14 September 2009.

128. Friday evening, 11 September 2009, Steele went to 304 Byron and Dr. Faltas printed another copy of her letter offering 21 September instead of 14 September as a mutually suitable date and went downstairs to hand it to Steele. Steele verbally abused Dr. Faltas and stretched her hand to push Dr. Faltas. Dr. Faltas quickly put the letter on Steele outstretched forearm, said "You got it" and turned away. Steele instinctively bent her outstretched arm to keep the letter from falling and, in the process, touched her own chest. Steele called Mason, who coached her to call police.

129. Recording of Steele's call, belatedly produced to Dr. Faltas in February 2010, has nothing at all about assault but only alleges verbal altercation. Defendant Passmore arrived and, from her window, Dr. Faltas saw him and his officers read the letter she had given Steele. Dr. Faltas became naively glad there was now police-confirmation that Steele had received the letter. But then she saw Crouch and Jones emerge from their apartments and mimic arms' gestures by Passmore and his unit. Dr. Faltas understood that Passmore was coaching Crouch and Jones to lie against Dr. Faltas.

130. Passmore yelled at Dr. Faltas from under her window that she must come down. Dr. Faltas asked Passmore to come up and speak to her. He then told her he will have her car towed "for a bad license plate on private property." Dr. Faltas told him her license plate was correct and current and asked to speak to Passmore's shift supervisor, Evans, and also engaged Attorney Whitlark to talk to Evans.

131. Evans told Whitlark that Dr. Faltas is charged with assault and Passmore denied having threatened to tow her car. Evans then told Dr. Faltas he will always take Passmore's word over hers, that she should never accuse Passmore of lying but should seek to speak to Captain Hendrix if she doesn't like what Passmore and others are doing, that all she needs to do is move but "for some ungodly reason" she is refusing to move. Passmore and his officers gave Steele a report and left. Whitlark charged Dr. Faltas two-hundred dollars for the call to Evans to make Passmore leave. Hendrix ignored Dr. Faltas.

132. In 2007, Dr. Faltas had learned of CPD's cheating scandal through the media but had not noted the names involved. In 2011, Dr. Faltas researched media reports and found that Passmore and Julie Ashmore were central figures in that cheating scandal but had not been adequately disciplined. Later, Passmore was named as a defendant in *McCoy v. City of Columbia et al.*, 10-cv-132-JFA (U.S. District Court, D.S.C.), for allegations that Passmore falsified McCoy's arrest record and concealed/destroyed the arrest and dashcam videos. Dr. Faltas tried to intervene as a plaintiff in that case; but her intervention was denied. The City of Columbia settled the case for $300,000.00 (three-hundred-thousand dollars). Thus, Passmore's history of dishonesty was known to the City and his supervisor, Evans, had no reason to take Passmore's word over Dr. Faltas'.

133. Later in September 2009, Ingram's visitors began intentionally taking detours to use the southern exit which is farther from their Garners-Ferry Road destination but closer to Dr. Faltas' window and car. They would honk at Dr. Faltas, extend their middle fingers at her, swerve as if to hit her car, loudly yell "Go back where you came from, you crazy a-- Egyptian b----," and threaten to rape and kill her.

134. Dr. Faltas sought restraining orders again against Steele, Mason, Ingram, John Doe and Jane Roe. They were eventually dismissed *without prejudice* by then-Richland County Magistrate Hudnell (Columbia office).

135. Dr. Faltas assessed Crouch, Ingram and Jones as money-driven and concluded a judgment against them would deter them more effectively than a restraining order. So she sued them in small claims.

136. Mason, who is NOT a lawyer, typed for Crouch, Ingram and Jones' signature answers and counterclaims to Dr. Faltas' complaint and recruited City's Attorney's office, Delaney, MG&C, and CPD in his schemes. From December 2009 to July 2010 and at Steele and Mason's behest, City thrice arrested Dr. Faltas, incarcerated her for five days, and caused her exile from her apartment for which she paid timely rent until March 2011, in which she lived alone with her cherished effects, and a substitute for which she could not secure due to lack of rental references and pendency of seven criminal charges against her. Dr. Faltas also now lives in constant inconsolable fear of being arrested any time by CPD on more false charges.

137. Examination of the videos of Dr. Faltas' 2 December 2009 arrest and of the documents related to

the searches and seizures of her house and car that day leaves no doubt of all Defendants' conspiracies to frame her and liability to her, particularly in light of Blanton's and Carter's testimony in Dr. Faltas' 22-26 February 2010 trial that: (1) a meeting at the highest CPD level was held to "coordinate" with the City Attorney's office and the Solicitor's office the arrests and seizures, (2) Bob Cooper "knew we were going after warrants," (3) there was intimate and frequent contact between CPD, Delaney, and Weiss before the arrests. On the day of the arrest, Mason accompanied Blanton. The later part of the videos have circumstance evidence that Delaney was allowed into Dr. Faltas' bedroom after she was arrested and taken to jail. Delaney likely stole Dr. Faltas' passport and later put it back.

138. **Very disturbing in the (still incomplete) arrest videos is that, when Dr. Faltas asks to be shown the warrants before opening her door for CPD, Passmore asks Blanton: "Are they felony warrants?" Blanton falsely answers "Yes." Blanton knew they were only misdemeanor warrants and she had no right to arrest Dr. Faltas with them as Blanton and Passmore did not observe any of Dr. Faltas' alleged acts. After Blanton lies to Passmore, Passmore yells at Dr. Faltas across the door that he will break it if she does not open. As soon as Dr. Faltas opens, Passmore, Blanton and others rush in, handcuff Dr. Faltas, refuse to let her call a lawyer, and never disclose to her that they have search warrants. They also take items not illegal and not covered by the search warrants, such as her family's credit cards she is authorized to use.**

139. It is also clear that all City agents were looking for was the evidence Dr. Faltas had gathered *publicly* against Steele, Mason, Ingram, Crouch, Jones, the Koons, and Delaney.

140. It is also clear that the hope and plan was for Dr. Faltas to resist arrest and be killed in the process with many CPD officers present to testify that her shooting was justified. When Dr. Faltas' strength of character displayed itself during her arrest and incarceration, Defendants resorted to falsification of records and perjury to ensure her conviction.

141. To return Dr. Faltas to jail unjustly, Weiss and Bob Cooper instructed CPD to falsely arrest Dr. Faltas on false charges of "unlawful use of telephone." Those were *nol prossed* <u>**WITHOUT leave to reopen**</u> **on 6 October 2010.**But the CMC continued to send Dr. Faltas notices for trial of this charge under penalty of trial in absentia if she does not show up. Dr. Faltas repeatedly showed up as scheduled at great cost and inconvenience to her only to be told that the City acknowledges it made a mistake in sending the notice; but only to have the cycle repeated later.

142. On 8 July 2010, with instructions from Weiss and Bob Cooper, Steele and Mason kidnapped Dr. Faltas and called CPD to come and arrest her. On instructions from Turner, Dr. Faltas' bond from the latest false "disorderly conduct" charge includes that she does not return to her apartment.

143. To prolong Dr. Faltas' suffering, Ferandez, Bob Cooper, Turner and Weiss, conspired together and with others to never call Dr. Faltas' cases for trial to make her exile from her own apartment permanent. When Dr. Faltas observed the corruption and "throwing" of the Mason sons' DUI cases in City's municipal court, Fernandez and Turner conspired with Bob Cooper and the Masons to deny Dr. Faltas access to Municipal court so she does not observe the corruption there and expose it.

144. In effect, Dr. Faltas was incarcerated in a hotel room for wich her mother and her sisters paid, and unable to travel outside South Carolina for four years without being convicted of anything. Dr. Faltas was also actually incarcerated in the dangerous ASDC several times without probable cause.

145.   On 22 December 2009, SC Circuit Judge Lee ruled basically that City brought charges against Dr. Faltas for Steele to gain unfair advantages in civil litigation. **Please see Exhibits to 3:10-cv-1985 (D.S.C.).** But Judge Lee's order continued to be violated with impunity by Steele, Mason and the City.

146. On 22-26 February 2010, Dr. Assa'ad-Faltas ably defended herself against the false harassment charges of her former neighbor, Teresa Ingram, at Steele's behest and the jury deadlocked. Shortly thereafter, Dr. Assa'ad-Faltas gathered irrefutable proof that the Prosecution's witnesses perjured themselves at her criminal trial. She therefore promptly moved for a hearing to present that proof.

147. After a 2 August 2010 hearing, Judge Cooper found Dr. Faltas is competent to defend herself *pro se* against the first degree harassment charges. The motion for speedy retrial or dismissal was renewed.

148.  To thwart a hearing for presentation of Dr. Faltas' proof of unfairness, Weiss remanded the charges as reduced to second-degree harassment to Columbia Municipal Court on 26 August 2010.

149.  Ingram was evicted from her apartment (where Steele kept her rent-free until she testified against Dr. Faltas) two weeks after she failed to secure a harassment conviction against Dr. Faltas, who promptly informed the General Sessions Court and moved for bond modification. It was never heard.

150.   *The* City retained, until September 2012, intellectual and tangible property taken from Dr. Faltas' apartment and car under false pretexts of two search warrants executed after her 2 December 2009

arrest and jailing. The seized items were returned to Dr. Faltas missing some and damaged.

151. Dr. Assa'ad-Faltas' wrists were severely bruised and her bones possibly fractured every time she was arrested because handcuffs were intentionally applied to her with excessive force. Each arrest also caused her to arrive at the jail with extremely high blood pressure near stroke levels.

152. **To recap the procedural and factual history of the false charges of harassment against Dr. Faltas:**

a. Plaintiff, Marie Assa'ad-Faltas, MD, MPH, is a first-generation legal immigrant Coptic Orthodox Christian quadrilingual physician (MD) and master of public health (MPH), from a family of naturalized and natural-born U.S. citizens, and has been since September 2005 lawfully admitted for permanent residence.

b. In March 2009, Plaintiff sued her landlady, Dinah Steele, for discrimination in rental terms and conditions and tortious interference with Petitioner's plan to build on land adjacent to Steele's two rental quadriplexes. On 2 December 2009, the City of Columbia's Police Department ("CPD") falsely arrested Petitioner and charged her with two counts of having "harassed" Steele and one Teresa Ingram, another Steele tenant, "in the first degree" by having: (a) sued Steele in civil court, (b) criticized Steele's management of the rental buildings, (c) inquired of Ingram if her rent was lower than Petitioner's for an identical apartment, (d) questioned in the apartments' parking lot a suspicious prowler who claimed to be Ingram's cousin, and (e) photographed one of Ingram's "guests" engaged in illegal acts in same parking lot.

c. One of the two harassment counts was called for jury trial on 22-26 February 2010 in General Sessions Court. Plaintiff defended herself ably *pro se;* and the jury deadlocked causing a mistrial. In March 2010, Plaintiff researched public records and uncovered massive irrefutable proof that all witnesses who testified against her had been suborned by the Prosecution, in conspiracy with Steele and CPD, for perjury and forgeries against Plaintiff, who then filed motions in General Sessions Court for a speedy trial/retrial or dismissal for prosecutorial misconduct, but no hearing thereon was scheduled. By August 2010, faced with Plaintiff's pending motions and aware that it had no *true* evidence with which to procure a conviction, the Prosecution purported to "remand" the charges as reduced to "harassment in the second degree" to Columbia's Municipal Court ("CMC"), owned and operated by the City of Columbia. Harassment in the first degree exceeds CMC's petty-offense jurisdiction; state law forbids change of indictments; and the Prosecution never sought indictments or warrants for harassment in the second degree. Plaintiff, suffering under oppressive bond conditions, moved CMC for speedy trial or dismissal of all charges against her.

d. Plaintiff's motions were finally scheduled for a 6 October 2010 hearing at CMC; but the city attorney diverted the hearing to *his* motion for a civil injunction restricting Plaintiff's access to CMC and to other City of Columbia's *public* buildings and offices. Plaintiff protested that CMC has no civil jurisdiction to entertain a civil injunction; but CMC Judge Marion Oneida Hanna proceeded to hear the City's motion.

e. During Plaintiff's *pro se* cross-examination of one of the City's witnesses, this occurred:

> **A.** I do recall you saying it was an incorrect receipt. I don't recall why you said it was incorrect.
> **Q.** Do you recall his having corrected it?
> **A.** I recall him starting to make some changes to the receipt, handwriting on it.
> **Q.** And after he did that it was satisfactory to me?
> The Court: I don't think she can make that assessment.
> **Q.** [by Plaintiff] Did I complain after he did the writing that I wanted to make it a correct receipt?
> **A.** Did you complain about the receipt?
> **Q.** Uh-huh.
> **A. Well, you were doing so much complaining and making so many statements at some point, I zoned you out.**
> **Q. Zoned out. And that makes you a competent lawyer and a competent witness, right?**
> The Court: **Dr. Faltas, that's it.** You are not here to insult people. [....] You are not here to argue with the court. We are here for a specific purpose. You sit down. **I find you in contempt of court.** We'll get to the punishment in a few minutes. **Have a seat.** ***** [S]o on this issue of contempt of court you may pay fifty dollars to the court or you may go to jail for ten days.

**f.** When Plaintiff tried to return to her speedy trial rights, CMC Judge Hanna threatened Plaintiff thus:
<u>Plaintiff:</u> The second question is you said that my cases were scheduled. **When are they scheduled?**
<u>The Court:</u> **I don't know when they are scheduled. I said they are on the docket and if you say one more word it's going to be thirty (30) days in jail and no possibility of paying a fine.**

**g.** On 11 October 2010, Plaintiff filed in SC Common Pleas Court appeal 2010-CP-40-7063 from that first contempt-of-court conviction. Per state law, CMC was thus divested of jurisdiction over the injunction.

**h.** On 13 October 2010, CMC Judge Hanna still issued the civil injunction the City wanted. Plaintiff renewed her speedy-trial/retrial-or-dismissal motions and they were scheduled for 28 March 2011, before CMC Judge Jenkins. But, before she could be heard by CMC Judge Jenkins, Plaintiff was taken before CMC Judge Hanna to answer allegations that Plaintiff had violated Hanna's 13 October 2010 injunction.

**i.** Plaintiff's knee lesions made it painful for her to physically stand; but she submitted a written request to be represented by counsel and to stand mute until counsel appears. But when Hanna refused to honor Plaintiff's rights, Plaintiff politely asserted that Hanna had no civil jurisdiction and, even if she did, her ruling was on appeal, which divested her of jurisdiction. Hanna responded by yelling at Plaintiff repeatedly, describing her as "mentally unstable," insisting on making her a witness against herself, and brutally aborting her cross-examination of the City's only witness. Hanna then sentenced Plaintiff to consecutive ten days in jail for having been unable to "stand when the judge entered the room" and fifteen days in jail for alleged violation of the civil injunction, and refused to stay the sentence pending appeal.

**j.** From jail, Plaintiff filed a petition for a federal writ of *habeas corpus,* No. 3:11-cv-809-TLW, in U.S. district court (D.S.C.), which was ultimately dismissed *WITHOUT* PREJUDICE as unexhausted, and appeal No. 2011-CP-40-2111 in state Common Pleas Circuit Court. Meanwhile, SC's Supreme Court issued an unprecedented 8 April 2011 order barring Plaintiff from filing in anything in SC state courts *pro se*.

**k.** After Plaintiff served her sentence and was released, her left knee was MRI-diagnosed as pathologically fractured and inflicted with other lesions. She then submitted to SC's Commission on Judicial Conduct an audio recording of the 28 March 2011 hearing before Hanna. Hanna was investigated and private sanctions, including banning her from sitting on any of Plaintiff's cases, was issued.

**l.** Nos. 2010-CP-40-7063 and 2011-CP-40-2111 were *inter alia* called in September 2011 before SC Circuit Judge Barber, who refused to hear from Plaintiff beyond ascertaining that she had tried but failed to hire a lawyer for lack of funds and urging her to try again. SC Circuit Judge Barber later dismissed the appeals "for want of prosecution" despite Plaintiff's having filed briefs before being banned from filing *pro se* and had appeared on the call of the cases. Plaintiff timely appealed to SC's Supreme Court, but the clerk of that court returned her appeals to her unfiled because they were not signed by an attorney.

**m.** Plaintiff filed timely *habeas* Nos. 12-cv-2228-TLW and 12-cv-2994-TLW in U.S. district court (D.S.C.). A U.S. magistrate judge recommended dismissal without prejudice. Plaintiff timely objected but the U.S. district judge summarily accepted the R&Rs. Plaintiff timely appealed to the U.S. Court of Appeals (4th Cir.) which summarily denied certificates of appealability and dismissed the appeals.

**n. The harassment charges, pending since December 2009, were finally called for trial by CMC on 13 August 2012. Petitioner *pro se* ably argued for, and was granted, their final dismissal *WITH* PREJUDICE.**

**p.** Because Dr. Assa'ad-Faltas' injuries from the unconstitutional statutes are capable of repetition yet evading review, she prays this Court to hold South Carolina's harassment and stalking statute and unlawful use of a telephone statute, as well as bond procedures wherein the alleged victim is not sworn or cross-examined all unconstitutional.

153. Dr. Faltas prays for acceptance, as incorporated herein by reference, of all transcripts of all relevant hearings before, and exhibits and discovery in, all state and municipal courts. She further seeks leave to file them and an electronic version of this Amended Intervenor Complaint electronically.

154. Dr. Faltas prays this Court to receive this verified Complaint as an affidavit but allow her to amend it and supplement it with exhibits as soon as practicable, for costs and damages, and for an immediate restraining order followed by a hearing, and for such further relief as the Court deems just or proper.

155. *Marmet Healthcare Center v. Brown*, 132 S.Ct. 1201, 1202 (2012), emphasized: "**When this** [U.S. Supreme] **Court has fulfilled its duty to interpret federal law, a state court may not contradict or fail to implement the rule so established. See U. S. Const., Art. VI, cl.2."**

156. Dr. Faltas alleges that none of the defendants is absolutely immune because each defendant is sued for non-judicial acts and that no defendant enjoys qualified immunity because each defendant acted in gross negligence and/or extreme malice and violated clearly established constitutional and statutory right of Dr. Faltas to her injury by falsely arresting her ad falsely imprisoning her, by denying her civil and constitutional rights of access to the courts and to public record and to freedom of movement and of observation of government functions, by intentionally inflicting severe emotional distress on her, by exposing her in gross negligence to dangers of severe bodily injury or death, by being deliberately indifferent to her medical needs while they confined her, and by racketeering to falsely frame her for alleged crimes she did not commit and to prevent her from completing transactions she was entitled to complete, **all to her personal and other damage.**

## IV. Prayers for Relief

157. Dr. Assa'ad-Faltas hereby respectfully prays this Court to:
   a. hold an immediate hearing on CPD's role in the fabrication and falsification of evidence against her and against others and to find that CPD has become a crime syndicate and should be dissolved immediately with all its members retrained before any of them applies to be rehired by the to-be-newly-constituted unified County law enforcement force;
   b. order SLED Chief Keel and U.S. Attorney Nettle to release the results of their months-long investigation into CPD misconduct and incompetence;
   c. order Attorney General Wilson to review all SC statutes held unconstitutional by the SC or U.S. Supreme Courts and/or by federal courts to cause SC's to repeal and/or rewrite them. In the interim, this Court should enjoin their enforcement by any and all officers in South Carolina, specially CPD;
   d. order all other Defendants herein-named to pay Dr. Assa'ad-Faltas: (i) the costs of this action, (ii) attorney's fees if such become applicable, and (iii) actual, compensatory and commensurate punitive damages to be determined by a jury on all issues triable to a jury;
   e. order Coroner Watts to reopen the cold case murder of Ella Faye Mason;
   f. order Solicitor Johnson to seriously consider prosecuting Mason and Steele for kidnapping;
   g. order U.S. Attorney Nettles to investigate Mason's, Steele's, Ingram's, and Crouch's fraud on the federal government;
   h. order all state and City of Columbia entities to refund to the federal government all monies they received under pretext of law enforcement but used for their personal purposes;
   i. order SC Circuit Judge Hood to hold a hearing on Dr. Faltas' un-reimbursed *pro se* defense expenses or declare that Dr. Faltas is entitled to such hearing forthwith;
   j. order CMC to cease operations as it is not a proper court;
   k. accept this Complaint as an affidavit; and
   l. order such other relief as this Court deems just and proper.

## V. Verification

Marie Assa'ad-Faltas, MD, MPH, decalres under penalty of perjury on 24 April 2015 that all factual allegations in this Complaint are true to her personal knowledge except if stated on information and belief, where they are believed to be true, that all exhibits previously attached to the cases referenced herein are true copies of the originals, and that the legal conclusions stated above are based in good faith on diligent research.

/Marie Assa'ad-Faltas, MD, MPH, Plaintiff

Respectfully submitted on 24 April 2015, all God so willing.
Marie Assa'ad- Faltas, MD, MPH, Plaintiff *pro se*
P.O. Box 9115, Columbia, SC 29290
Telephone: (803) 783-4536
e-mail: Marie_Faltas@hotmail.com and MarieAssaadFaltas@GMail.com